## COOK *v.* STATE

[No. 308, September Term, 1960.]

*Decided June 15, 1961.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY and SYBERT, JJ.

*John P. Moore,* for appellant.

*Joseph S. Kaufman, Deputy Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Leonard Kardy, State's Attorney for Montgomery County,* on the brief, for appellee.

PRESCOTT, J., delivered the opinion of the Court.

George Edward Cook was convicted, in the Circuit Court for Montgomery County, of murder in the first degree, and sentenced to confinement for the period of his natural life.

There was testimony, which, if believed by the jury, established the following facts: the appellant was 43 years of age and had been married for 19 of them. The deceased, one Fred Blowers, was 41 years old, and he also was married. Blowers, his wife and the appellant all worked at the same place in Bethesda, Maryland—Blowers working a shift from late afternoon until midnight, and his wife and the appellant working the day shift. The appellant and Blowers' wife became enamored of each other, and they had had sexual relations several times before May 24, 1960 (this was admitted by the appellant), the date when Blowers was killed.

On the day of the killing, the appellant went to the Blowers apartment at about 5:00 p.m., accompanied by his son David, age 15, and six bottles of beer. Blowers and David went outside to work on Blowers' car. The appellant admitted kissing and making love to Mrs. Blowers during their absence, and also asked her "to go away with him," which she declined to do.

When Blowers and David returned, the appellant and Blowers finished consuming the beer, and the appellant went out and got two bottles of whiskey. The appellant, Blowers and David began drinking the whiskey, and Blowers, challenging David as to his ability to consume the same, poured him large drinks until the boy became sick and insensible. At about 10:45 p.m., the appellant carried his son to appellant's automobile and took him to his home in Frederick, a distance of some 12 to 15 miles. There was no argument between the appellant and the deceased, who retired about 11:00 p.m.

Later, Mrs. Blowers was awakened by a knocking at the door. Her husband called, "George, is that you?" An affirmative response was made by a voice, which she recognized as Cook's. Blowers unlatched the door, but did not open it, and went to the bathroom. There was another knock on the

door, and her husband said, "Come in." She heard someone say, "Freddy," and her husband reply, "Yes," and then came the shot. She saw Cook, the appellant, going through the living room, out the door, with a gun in his hand.

Mrs. Blowers' sixteen-year-old daughter was also awakened by a knocking on the door and she heard a few words, spoken moderately, between her father and the visitor, and the voice of the latter was Cook's.

The manager of the apartment house where the Blowers family lived was awakened by the shot. He raised the curtain, and saw a green Oldsmobile, belonging to Cook, leave the parking lot, with the headlights off.

The appellant was apprehended at his home in Frederick at about 12:45 a.m. on the morning of May 25th. A search of his premises produced a 12-gauge shotgun found under a shack in the rear of the home, a green Oldsmobile and a fired 12-gauge shotgun shell on the ground a few feet from its left front wheel. An expert testified that this shell had been fired from the gun found in the rear of the appellant's premises.

The appellant, testifying in his own behalf, confirmed the events down to the time that he took David home, as they have been related above. However, he claimed that he had no recollection of what occurred after he tried to "revive" David when the appellant got him home. He said that he had no recollection of returning to the Blowers' apartment, and denied that he owned a shotgun at the time of the killing, and that he had told the police, as they claimed, that he had borrowed his brother's shotgun. The first thing that he recalled after trying to revive David was when the police came to take the appellant into custody.

The appellant makes five assignments of error: (1) that the trial court erred in failing to include the issue of insanity in his instructions to the jury; (2) that there was error in the trial court's failing to rule on the appellant's request for a new trial; (3) that it was reversible error to admit into evidence two photographs of the deceased; (4) that the trial court was in error in refusing the appellant's motion to with-

draw a juror and declare a mistrial; and (5) that the appellant's motion for a directed verdict should have been granted.

## I

No extended discussion of this point is required. The indictment was returned on October 6, 1960. October 28th following, the appellant filed a written plea of insanity. On November 2, 1960, the court ordered that he be confined in a State hospital on an ambulatory basis for observation and that at the expiration of the period of observation he be returned for trial, and a copy of the order was sent to the Department of Mental Hygiene. On November 22, 1960, he was arraigned and pleaded not guilty. Although the report of the Department of Mental Hygiene is not in the record, obviously the Department determined he was sane; otherwise he would not have been returned for trial. Code (1957), Article 59, Section 11. No evidence was offered at the trial in an attempt to establish that the defendant was insane. After informing the jury that his instructions were advisory, the court below instructed them that they could return any one of five possible verdicts, none of which related to the question of the defendant's insanity. No objection to the court's omission of such an issue in his charge was made, nor was there any request that he include the issue of insanity therein. In the absence of a showing that the trial court's failure to include the issue of insanity in his instructions constituted plain error material to the rights of the accused, a showing that the record fails to reveal, the question, clearly, is not before us for determination. Maryland Rule 739 f, g. Cf. Code (1957), Article 59, Section 7, and *Rose v. State*, 177 Md. 577, 582, 10 A. 2d 617.

## II

After his conviction, the defendant mailed an undated communication to the Clerk of the Circuit Court. It was received by the Clerk some twenty-six days after the jury's verdict. It read, in pertinent part: "I would like for you to make a note of appeal * * *. I have new evidence pertaining to my case and would like to have a new trial." The Clerk treated

this communication as an appeal, and entered the appeal on his docket. Three days thereafter, the court appointed counsel for the defendant. The defendant now claims (for the first time) that his communication was a motion for a new trial, and the lower court erred in not hearing and ruling upon the motion. This is obviously an afterthought: no request, even after counsel was appointed for the appellant, was made for a hearing on the purported motion for a new trial. Moreover, if it were a motion for a new trial, it was filed too late. Maryland Rule 567 a. We find no error here.

### III

During the course of the trial, the Coroner testified that he proceeded to the deceased's apartment at about 1:00 a.m. on the morning of May 25, 1960. There he found the body of the deceased lying on the floor with a gunshot wound, one and one-half inches by one and one-quarter in the upper right chest. Two photographs of the body, taken at that time and verified as being true and fair representations of the body, were admitted, over objection. The photographs were used by the Coroner in describing the wound and its location upon the body of the deceased. The appellant argues that "the conclusion is inescapable that the photographs of the deceased were inflammatory and were such as to create prejudice against the defendant." However, he fails, utterly, to show in what manner the photographs tended to create prejudice against him. The exhibits were simple photographs of the body of the deceased showing a single gunshot wound in the upper right chest, which had been described by the Coroner. It is difficult to discern how photographs of this simple nature were "inflammatory," or "were such as to create [legal] prejudice against the defendant." Whether or not a photograph is of practical value in a case is within the sound discretion of the trial court, whose decision thereon will not be disturbed unless plainly arbitrary. *Corens v. State,* 185 Md. 561, 570, 45 A. 2d 340; *Consolidated Gas, etc., Co. v. Smith,* 109 Md. 186, 199, 72 A. 651. Cf. *Madison v. State,* 200 Md. 1, 7-8, 87 A. 2d 593. We find no abuse of discretion in admitting the photographs.

## IV

When the appellant was on the stand, the State's Attorney asked him if he had ever been convicted of a crime, and he answered that he was "pretty sure" he had not. Whereupon, the State's Attorney inquired, "How about on December 31, 1937, tell these gentlemen, and the Court, what you were convicted of then?" The appellant replied that he did not know. The State's Attorney, overzealously, proceeded with his questioning: "On December 31, 1937, you were charged with breaking and entering; you were tried on March 10, 1938, and you received a generally suspended sentence up in Frederick [a statement, not a question]. Do you remember that?" The appellant replied that he did not. The appellant's counsel moved for a mistrial. The State's Attorney did not then, nor at any subsequent time, proffer to show that the appellant had been convicted of a crime, as was so strongly intimated in his questions, nor did he ask leave of the court to explain to the jury that he desired to disclaim any intimation from his question that the defendant had previously been convicted of a crime. The questions were, we think, highly improper in the absence of the State being able to establish that the defendant had been convicted in accordance with the statement of the State's Attorney; and, were it not for the care with which the trial court explained the matter to the jury, would require a reversal of the judgment and a new trial. However, the court stated to the jury:

> "Now, gentlemen of the jury, certain questions asked by the State's Attorney, with reference to a possible prior criminal record of the defendant, has been called to my attention by a motion. The question was, or the series of questions, concerned whether or not the defendant had been previously convicted of an offense in Frederick County, Maryland. The State's Attorney's question pin-pointed a certain particular date and offense.
> "I want to tell you that the mere asking of a question or question itself does not constitute evi-

dence in a case. The answers to questions constitute the evidence. The defendant answered to that question that he had not been convicted of a crime, so the evidence before you is that he has not been convicted of a crime.

"I am making this statement, because of any possible inference that might have been drawn from the State's Attorney's question. There is no evidence before you that the defendant has been convicted of any crime. * * *."

This Court has stated that the trial court is in an advantageous position to judge the question of prejudice, and its decision with reference thereto should not be reversed unless it is clear that there was prejudice. *Lusby v. State,* 217 Md. 191, 195, 141 A. 2d 893. In view of the statement made by Judge Pugh, quoted above, we cannot say that he abused his discretion in denying the motion for a mistrial.

## V

The testimony, as we have previously stated it, was clearly sufficient to take the case to the jury on the question of first degree murder. *Brown v. State,* 220 Md. 29, 37-39, 150 A. 2d 895, (and compare *Chisley v. State,* 202 Md. 87, 95 A. 2d 577; *Grammer v. State,* 203 Md. 200, 225, 100 A. 2d 257; *Lee v. State,* 224 Md. 260, 167 A. 2d 595), and the questions of malice, wilfulness, deliberation and premeditation were for the jury to determine.

*Judgment affirmed.*